IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NANCY L. ELLIOTT,

     Plaintiff,

v.

SPECIALIZED LOAN SERVICING, LLC,

     Defendant.

CIVIL ACTION FILE NO.:

1:16-cv-4804-TWT-JKL

## ORDER AND NON-FINAL REPORT AND RECOMMENDATION

In this wrongful foreclosure case, Plaintiff Nancy L. Elliott asserts that Defendant Specialized Loan Servicing, LLC ("SLS") wrongfully foreclosed on her home and then failed to properly calculate and distribute excess proceeds from the foreclosure sale to her. The case is before the Court on SLS's Motion to Dismiss [Doc. 5], Elliott's Motion to Strike Defendant's Motion to Dismiss [Doc. 12], Elliott's "Conditional Motion for Leave to File an Amended Complaint" (the "Motion for Leave to Amend") [Doc. 13], and SLS's "Motion for a Stay of

1

Proceedings Pending the Payment of Costs, Including Attorneys' Fees Pursuant to Rule 41(d)" (the "Rule 41(d) Motion") [Doc. 26].

For the reasons that follow, I **RECOMMEND** that SLS's Motion to Dismiss be **GRANTED IN PART AND DENIED IN PART**.  It is further **ORDERED** that Elliott's Motion to Strike Defendant's Motion to Dismiss be **DENIED**, that Elliott's Motion for Leave to Amend be **DENIED**, and that SLS's Rule 41(d) Motion be **DENIED**.

## I.    BACKGROUND

For purposes of considering the motions pending before the Court, the following facts alleged in Elliott's First Amended Complaint [Doc. 2] are taken as true.[1]

In June 1999, Elliott purchased real property located at 615 Stations Drive, Woodstock, GA (the "Property").   [Doc. 2 ¶ 6.]   In September 2002, she refinanced the Property with a loan in the principal amount of $100,000 (the "Loan") from Crescent Bank and Trust Company.  [Doc. 2 ¶ 7.]  The Loan was

---

[1] The First Amended Complaint refers to exhibits that were attached to Elliott's initial complaint.  The initial complaint and the attachments are docked at entry no. 1-1.  When referring to exhibits to the First Amended Complaint, I refer to the corresponding page number of document 1-1 generated automatically by CM/ECF.

secured by the Property, as evidenced by a Security Deed dated September 13, 2002 (the "Security Deed").  [Doc. 2 ¶ 6; Doc. 1-1 at 46-61 (Security Deed).]  Elliott's monthly mortgage payment was $1,087.70.  [Doc. 2 ¶ 24.]

In November 2003, Chase Manhattan Mortgage Corporation ("CMMC"), a predecessor-in-interest to JPMorgan Chase Bank, N.A. ("Chase"), assumed responsibility for servicing the Loan.  [Doc. 2 ¶ 17.]  In March 2013, Mortgage Electronic Registration Systems, Inc. ("MERS"), on behalf of CMMC, assigned the Security Deed to Chase.  [Doc. 2 ¶ 18; Doc. 1-1 at 65 (Assignment of Security Deed).]

Before January 2013, when Chase was servicing the Loan, Elliott would periodically fall behind on her payments, but would always bring herself current. [Doc. 2 ¶ 19.]  Chase affirmatively worked with Elliott and did not ever seek to accelerate or foreclose on the Loan.  [*Id.*]  Elliott would also make catch-up payments to Chase, which Chase "received."  [*Id.* ¶ 21.]

In late 2012 or early 2013, Elliott fell behind on her payments.  On January 10, 2013, Chase sent an "Acceleration Warning (Notice of Intent to Foreclose)" letter to Elliott.  [Doc. 2 ¶ 25.]  On January 25, 2013, Elliott paid $1,100 to Chase, which accepted and deposited the funds.  [*Id.* ¶ 26.]  On February 8, 2013, Elliott

3

paid an additional $1,100 to Chase, which accepted and deposited the funds. [Doc. 2 ¶ 27.]

On February 11, 2013, Chase sent a second "Acceleration Warning (Notice of Intent to Foreclose)" letter to Elliott, which reflected Elliott's recent payments. [Doc. 2 ¶ 28.]  On February 25, 2013, Elliott paid $400 to Chase, which accepted and deposited the funds.  [*Id.* ¶ 29.]  Then, on March 13, 2013, Chase sent a third "Acceleration Warning (Notice of Intent to Foreclose)" letter to Elliott, which reflected Elliott's recent payments.  [*Id.* ¶ 30.]  The letter indicated that Chase could accelerate the maturity of the Loan, but did not expressly state that it would do so if Elliott did not cure her default.  [*Id.* ¶ 31.]  Elliott maintains that Chase did not formally notify her that it had accelerated the Loan.  [*Id.* ¶ 32.]

On May 30, 2013, Elliott tendered a check in the amount of $4,000 to Chase, which she contends was sufficient to reinstate the Loan.  [Doc. 2 ¶¶ 33-34.]  Elliott made the $4,000 payment more than five days before any scheduled sale of the Property and before any judgment enforcing the Security Deed had been entered.  [*Id.* ¶ 35.]

On or about June 5, 2013, Chase returned Elliott's $4,000 payment and advised her that it was unable to accept the funds because they were insufficient

to cure the default.  [Doc. 2 ¶ 37, Doc. 1-1 at 63.]  Chase separately told her that the check was being returned because it was not in certified funds.  [*Id.* ¶ 38.]  At that time, Elliott had sufficient funds to cover any balance remaining on the reinstatement amount, but neither Chase nor SLS gave her the proper reinstatement amount.  [*Id.* ¶ 39.]  Elliott maintains that "consistent with the parties' prior course of dealing and conduct," Chase should have applied the $4,000 payment to the reinstatement amount and sent her a new acceleration notice as it had several months earlier.  [*Id.* ¶ 40.]

On June 12, 2013, Elliott called Chase to get the total amount that Chase claimed remained due on the Loan.  [Doc. 2 ¶ 41.]  Chase's representatives assured her that the amount due would be sent to her as requested; however, Chase did not notify her of the amount due under the Loan.  [*Id.*]  In fact, Chase could not provide Elliott with a reinstatement amount because the Loan was in the process of being reassigned to SLS for servicing; thus, even if Chase had provided Elliott with a reinstatement amount, it would have been invalid.  [*Id.* ¶ 42.]

On June 21, 2013, Elliott contacted SLS and spoke with "Miriam."  [Doc. 2 ¶ 44.]  During the telephone call, Elliott told Miriam that Chase had returned the

$4,000 check and that she had the funds to reinstate the Loan.  Elliott stated: "I feel like I am getting the run around" and "I'm trying to get it caught up.  I have the money to do so.  I just can't seem to get anyone to tell me who, you know, the amount and where to send it or anything.  It's kind of frustrating."  [*Id.*]  SLS therefore knew that Elliott wanted to reinstate the Loan.  [*Id.* ¶ 45.]

On June 29, 2013, Chase assigned the Loan and the Security Deed to SLS. [Doc. 2 ¶ 47; Doc. 1-1 at 65 (assignment of Security Deed).]  Before SLS foreclosed, it certified to its foreclosure attorney that "a non-foreclosure outcome could not be reached" before instructing the attorney to proceed with foreclosure. [Doc. 2 ¶ 50; Doc. 1-1 at 67 (August 27, 2013 letter from SLS to McCurdy & Candler).]

In August 2013, SLS began foreclosure proceedings on the Property.  [Doc. 2 ¶ 51.]  On September 3, 2013, SLS sold the Property at foreclosure for $82,000 to ColFin AH-Georgia 5, LLC ("ColFin").  [*Id.* ¶¶ 52, 77.]  As of the foreclosure sale, according to SLS, the outstanding principal balance of the Loan was $40,586.38, which left an excess balance of $41,413.62.  [*Id.* ¶¶ 55-56, Doc. 1-1 at 73.]  At the time of the foreclosure sale, the fair market value of the property was $145,000.  [Doc. 2 ¶ 53.]  SLS did not immediately distribute the excess

proceeds to Elliott, and instead commingled the funds with other funds and sent the funds to third parties.  [Doc. 2 ¶ 64.]

One day after the foreclosure sale, September 4, 2013, SLS sent a letter to Elliott advising her that she could obtain help making mortgage payments towards the Loan through a loss mitigation program.  [Doc. 2 ¶ 71; Doc. 1-1 at 80.]

Elliott first learned of the foreclosure sale when she received a demand for possession of her home from counsel for ColFin, the purchaser of the Property. [Doc. 2 ¶ 77.]  Had Elliott known of the foreclosure at the time of the foreclosure sale, she would have been able to obtain financing to pay off the Loan in its entirety, or alternatively, would have reinstated the Loan under the terms of the Security Deed.  [*Id.* ¶¶ 78-79.]  After the foreclosure, ColFin began eviction proceedings against Elliott.  [*Id.* ¶ 81.]  She was dispossessed from the Property, became homeless, and lived in her car.  [*Id.* ¶ 82.]  One evening during the period in which she was living in her car, she was physically assaulted and suffered significant physical and emotional harm.  [*Id.* ¶ 83.]  She also suffered economic and emotional harm, as she was forced to find lodging for her three dogs.  [*Id.* ¶ 84.]

On June 17, 2014, Elliott filed a lawsuit in the Superior Court of Cherokee County ("the Cherokee County Action") against SLS, Chase, and ColFin seeking, *inter alia*, to set aside the foreclosure sale and the disbursement of the excess proceeds of the foreclosure sale, which had still not been paid to her during the more than nine months after foreclosure.  [Doc. 2 ¶ 66; *see also* Doc. 1-2 at 2 (referring to date of filing suit in Cherokee County).]  On December 2, 2014, SLS tendered $38,655.91 (the amount that it contended to be the excess proceeds of the foreclosure) into the registry of the Cherokee County Superior Court.  [Doc. 2 ¶ 67.]  Almost a year and a half later, on April 18, 2016, the Cherokee County Superior Court ordered that the funds be disbursed to Elliott.  [*Id.* ¶ 69; Doc. 1-1 at 75-77).]  According to Elliott, SLS still owes her some portion of the difference between $41,413.62 (the foreclosure sale proceeds minus the principal amount of the Loan) and the disbursed amount of $38,655.91.  [Doc. 2 ¶ 70.]

At some point after the Cherokee County Superior Court ordered the disbursement of the funds, Elliott voluntarily dismissed without prejudice the Cherokee County Action.  [Doc. 2 ¶ 1.]  On November 29, 2016, Elliott filed this renewal action in the Superior Court of Gwinnett County against SLS, asserting the same claims that she had brought in the Cherokee County Action.  [Doc. 1-1

8

at 1.]  On December 5, 2016, Elliott filed the First Amended Complaint, which is the operative complaint in this case.  [Doc. 2.]  In the Amended Complaint, Elliott asserts the following claims against SLS, all of which arise under Georgia law: (1) wrongful foreclosure; (2) breach of contract; (3) breach of the implied duty of good faith and fair dealing; (4) intentional "and/or" negligent infliction of emotional distress; (5) fraud; (6) negligent misrepresentation; (7) civil theft by deception; (8) breach of legal duty; (9) conversion; (10) money had and received; (11) punitive damages; and (12) attorneys' fees.

On December 30, 2016, SLS removed this action to federal court under this Court's diversity jurisdiction.  [Doc. 1.]  On January 6, 2017, SLS filed a motion to dismiss all claims in this action under Federal Rule of Civil Procedure 12(b)(6).  [Doc. 5.]  Elliott has filed a response in opposition to the motion to dismiss [Doc. 14] and SLS has filed a reply [Doc. 16].

Elliott has also filed a motion to strike SLS's motion to dismiss, or alternatively, certain exhibits that SLS attached to its motion to dismiss on the grounds that SLS improperly cites to and relies on materials outside the four corners of the complaint.  [Doc. 12].  SLS has responded to the motion to strike [Doc. 17], and Elliott has filed a reply [Doc. 22].

Elliott has additionally filed a Motion for Leave to Amend in which she requests the Court to grant her leave to amend her complaint to correct any pleading defects that might otherwise subject her operative complaint to dismissal.  [Doc. 13.]  SLS opposes the motion [Doc. 18], and Elliott has filed a reply in support of her motion [Doc. 23].  On May 18, 2017, I held oral argument on these motions.

On April 13, 2017, SLS filed a motion to stay these proceedings and for an award of attorney fees and costs under Federal Rule of Civil Procedure 41(d). Specifically, SLS requests that this Court award it a portion of the fees and costs it incurred defending the Cherokee County Action in the amount of $78,140, and that the Court stay these proceedings pending Elliott's payment of that amount. [Doc. 26.]  Elliott opposes the motion [Doc. 36], and SLS has filed a reply in support of its request [Doc. 38].

I discuss the pending motions in the following order:  (1) Elliott's Motion to Strike; (2) SLS's Motion to Dismiss; (3) Elliott's Motion for Leave to Amend; and (4) SLS's Rule 41(d) Motion.

## II.   MOTION TO STRIKE [Doc. 12]

Elliott moves the Court to strike the motion to dismiss in its entirety because SLS "knowingly and intentionally went far beyond the scope of Ms. Elliott's complaint" and its "improper statements" have tainted the motion.  [Doc. 12 at 1.]   Alternatively, Elliott urges the Court to strike the following exhibits attached to SLS's motion:

- Exhibit B [Doc. 5-3]:  Assignment of Security Deed from Crescent to Chase.

- Exhibit C [Doc. 5-4]:  Records from the New Jersey Secretary of State regarding CMMC

- Exhibit G [Doc. 5-8]:   Elliott's initial complaint in the Cherokee County Action

- Exhibit H [Doc. 5-9]:  SLS's Motion to Pay Funds into the Registry of the Court field in the Cherokee County Action

- Exhibit I [Doc. 5-10]:  Elliott's Motion for Emergency Hearing filed in the Cherokee County Action

- Exhibit J [Doc. 5-11]:   April 2, 2015 Order granting SLS's partial motion to dismiss, entered in the Cherokee County Action

11

- Exhibit K [Doc. 5-12]:   July, 23, 2013 Letter from McCurdy & Candler, LLC to Elliott regarding the impending foreclosure on the Property

- Exhibit L [Doc. 5-13]:  June 23, 2013, Letter from SLS to Elliott

Elliott further moves the Court to strike "all argument related to or arising from these Exhibits" and "SLS's unsupported 'factual' averments throughout its brief in support of its motion to dismiss."  [Doc. 12 at 1-2.]  Finally, Elliott moves to strike additional documents that SLS attached to its reply brief:  (1) Exhibit A [Doc. 16-1], which purports to be a letter dated June 24, 2013 from SLS to Elliott providing her with the amount necessary to reinstate her loan; and (2) Exhibit B [Doc. 16-2], a copy of a consent order and judgment entered against Elliott in a dispossessory action that was pending in the Magistrate Court of Cherokee County, Georgia.

I will consider Elliott's objections, as applicable, in my analysis of SLS's motion to dismiss; however, the motion to strike should be denied because it is procedurally improper.  Rule 12(f) of the Federal Rule of Civil Procedure, which authorizes motions to strike, states that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or

scandalous matter." The rule explicitly provides that the object of a strike must be in a "pleading," which the rule defines as a complaint, an answer; a reply to a counterclaim; an answer to a cross-claim; a third-party complaint; and a third-party answer. Fed. R. Civ. P. 7(a). A motion to dismiss and its attachments are not included among those types of filings; thus, a motion to strike is not the appropriate procedural vehicle to object to evidence or argument. *See Alyshah v. Georgia,* No. 1:06-cv-9030-TWT, 2006 WL 2583288, at *2 (N.D. Ga. Sept. 5, 2006) (denying motion to strike motion to dismiss because "a motion to dismiss is not a 'pleading' within the meaning of Rule 12(f)"). Accordingly, Elliott's Motion to Strike Defendant's Motion to Dismiss [Doc. 12] is **DENIED**; however, as noted above, I will consider whether it is appropriate to rely on particular exhibits in my analysis of SLS's motion to dismiss.

## III.   MOTION TO DISMISS [Doc. 5]

### A.   Standard on Motion to Dismiss

In evaluating a Rule 12(b)(6) motion to dismiss, a court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not provide "detailed factual allegations," but it must provide

13

factual allegations sufficient to set forth the plaintiff's entitlement to relief. *Twombly*, 550 U.S. at 555.   Providing only "labels and conclusions" is insufficient, "and a formulaic recitation of the elements of a cause of action will not do." *Id.*  The court is not required to accept as true legal conclusions couched as factual statements. *Iqbal*, 556 U.S. at 678.   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id*. at 679 (internal quotation marks, bracket, and citation omitted).

Generally, a court may not consider matters outside the pleadings when evaluating a motion to dismiss without converting the motion to a motion for summary judgment.  *See* Fed. R. Civ. P. 12(d); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368-69 (11th Cir. 1997).  An exhibit to a pleading is part of the pleading, and therefore may be considered.  *See* Fed. R. Civ. P. 10(c); *see Brooks*, 116 F.3d at 1368 ("[T]he analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto.").  A document not physically attached to a pleading may be considered if the document's contents are alleged in the complaint and no party questions its contents, provided that the document is central to the plaintiff's claim and its

authenticity is not challenged.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

### B.    Analysis

#### 1.    Count I:  Wrongful Foreclosure

Count I of the Amended Complaint is a claim for damages for SLS's alleged wrongful foreclosure of the Property.  Elliott bases her claim on four theories.  First, Elliott alleges that the foreclosure was wrongful because she had reinstated the Loan when she tendered the $4,000 payment to Chase in May 2013.  Second, Elliott asserts that if the $4,000 was insufficient to reinstate the loan, SLS still had no right to foreclose because she and Chase mutually departed from the terms of the Security Deed.  Specifically, she contends that before foreclosing, Chase was obligated to send her another acceleration notice reflecting the amount that she owed, as it had on at least one previous occasion.  Third, Elliott contends that the foreclosure was wrongful because SLS failed to provide notice of foreclosure, specifically, notice required under O.C.G.A. § 44-14-162.2.  Fourth, she contends that SLS failed to distribute the excess proceeds to her "immediately."

In Georgia, a plaintiff asserting a claim of wrongful foreclosure must show: (1) a legal duty owed to her by the foreclosing party; (2) a breach of that duty; (3)

a causal connection between the breach and the injury she suffered; and (4) damages.  *Gregorakos v. Wells Fargo Nat'l Ass'n*, 285 Ga. App. 744, 747-48 (2007).  "[A] violation of [Georgia's foreclosure] statute is necessary to constitute a wrongful foreclosure."  *McCarter v. Bankers Trust Co.*, 247 Ga. App. 129, 132 (2000)  (citing O.C.G.A. §§ 23-2-114, 44-14-160, *et seq.*) (other citations omitted)).  Applying these standards, I address the theories on which Elliott bases her claim for wrongful foreclosure.

### a.     Elliott Has Plausibly Alleged that She Reinstated the Loan.

SLS argues that "simple logic and arithmetic dictates Elliott never reinstated her loan."  [Doc. 16 at 4.]  Specifically, SLS contends that the March 13, 2013 acceleration letter required Elliott to pay $2,151.63 within 35 days of March 13, 2013 to reinstate the loan, and that additional mortgage payments came due on April 1 and May 1, 2013, each in the amount of $1,087.70.  [*Id.* (citing Doc. 2 ¶ 24; *id.* ¶ 7; Doc. 1-1 at 42 (promissory note).]  Thus, SLS maintains, Elliott would have had to tender at least $4,327.03 on May 30, 2013 to have reinstated the Loan.  [*Id.* at 5-6.]

Viewing the allegations in the light most favorable to Elliott, I am not convinced that SLS's math is correct because it is unclear what amount Elliott

was required to pay under the March 13, 2013 letter to reinstate the Loan.

Paragraph 2 of the March 13 letter states:

> As of March 13, 2013, total monthly payments (including principal, interest, and escrow if applicable), late fees, insufficient funds (NSF) fees, and other fees and advances due under the terms of your loan documents in the total amount of ***$1,841.50*** are past due.

[Doc. 5-5 at 2 (emphasis added).] The letter then itemizes the past due amount as follows:

| | |
|---|---|
| Total Monthly Payments | $2,151.63 |
| Late Fees | $162.08 |
| NSF Fees | $0.00 |
| Other Fees | $0.00 |
| Advances | $0.00 |
| Amount Held in Suspense | $471.21 |

[*Id.*] Thus, the total amount due as of March 13, 2013 was $***1,841.50***, which is the sum of the total monthly payments ($2,151.63) plus late fees ($162.08), less amounts held in suspense ($472.21).

Confusingly, Paragraph 3 of the March 13 letter states that in order to cure the default, Elliott had to "pay the Total Monthly Payments listed in Paragraph 2 within 35 days" and "[a]ll late fees, NSF fees, and other fees and advances are still valid and will need to be repaid under the terms of your loan documents." [Doc. 5-5 at 3.] It is unclear what the phrase "Total Monthly Payments" refers to.

17

One reading could be that it refers to $2,151.63, which is how the phrase appears to be defined in Paragraph 2 of the letter.  But that may not be the correct reading because the letter also states that Elliott was past due in the total amount of $1,841.50 at that time, which is a lower figure.  Another reading could be that the amount Elliott had to pay was $1,841.50, but that figure includes late fees, and Paragraph 3 of the letter seems to indicate that she was not required to pay late fees to reinstate the loan.  Yet another interpretation of the letter is that if she did not have to pay late fees to cure the default, and that the "Total Monthly Payments" was $2,151.63 less the $472.21 held in suspense, the total amount she was required to pay was $1,679.42.  Adding that number to the April and May payments that came due gives a total of $3,854.82, nearly $150 less than the $4,000 that she tendered to Chase on May 30.

The bottom line is that whether the $4,000 payment was sufficient is a question more appropriately addressed at the summary judgment stage than on a motion to dismiss because I cannot tell based on the pleadings and attachments what amount Elliott was actually required to pay to bring her loan current.

Accordingly, I conclude that Elliott has alleged facts that plausibly suggest that she did reinstate the loan in May 2013.[2]

> **b.      Elliott Has Plausibly Alleged that SLS Did Not Provide Statutory Notice of the Foreclosure.**

Elliott next alleges that SLS had no legal right to foreclose on the property because SLS failed to provide proper notice of the foreclosure sale under O.C.G.A. § 44-14-162.2.  Under Georgia law, a foreclosing party has the duty to exercise fairly the power of sale in a deed to secure debt under O.C.G.A. § 23-2-114.  *Sheely v. Bank of Am., N.A.*, 36 F. Supp. 3d 1364, 1376 (N.D. Ga. 2014).  "This includes a mandate that '[n]otice of the initiation of proceedings to exercise a power of sale . . . be given to the debtor by the secured creditor no later than 30 days before the date of the proposed foreclosure.'" *James v. Bank of Am., N.A.*, 332 Ga. App. 365, 366 (2015) (quoting O.C.G.A. § 44-14-162.2(a)).   "And

---

[2] In light of my rejection of SLS's argument relating to the reinstatement amount, I do not address Elliott's theory of mutual temporary departure at this time.  As I noted at oral argument, I have reservations concerning the viability of such a theory following the Eleventh Circuit's holding in *Chadwick v. Bank of America, N.A.*, 616 F. App'x 944, 949 (11th Cir. 2015), which affirmed this court's rejection of a similar argument based on identical language in a security deed, *see Chadwick v. Bank of Am., N.A.*, No. 12-cv-3532-TWT, 2014 WL 4449833, at *6 (N.D. Ga. Sept. 9, 2014).  If necessary, the Court can take that issue up at summary judgment.

'[when] a foreclosing creditor fails to comply with the statutory duty to provide notice of sale to the debtor in accordance with O.C.G.A. § 44-14-162 *et seq*., the debtor may either seek to set aside the foreclosure or sue for damages for the tort of wrongful foreclosure." *Id.* at 366-67 (quoting *Roylston v. Bank of Am., N.A.*, 290 Ga. App. 556, 559 (2008)); *see also Carter v. HSBC Mortg. Servs., Inc.*, 622 F. App'x 783, 787 (11th Cir. 2015).

SLS advances two arguments in opposition to Elliott's wrongful foreclosure claim predicated on the lack of statutory notice. First, SLS contends that it did not breach any duty because Elliott received notice of the foreclosure. [Doc. 5-1 at 13.]   In support, SLS relies on letters from SLS's foreclosure counsel, McCurdy & Candler, to Elliott, including a notice dated July 23, 2013, advising Elliott that the Loan had been referred to the firm for foreclosure, [*see* Doc. 5-12 at 2-3], and a letter dated August 2, 2013 notifying Elliott of the foreclosure and enclosing a copy of the notice of sale under power, [*see id.* at 7-9].   Those notices are attached as Exhibit K to SLS's motion to dismiss.  Elliott responds that the Court cannot consider the purported foreclosure notices on a motion to dismiss, principally because she disputes the authenticity of the documents and denies ever receiving them.  [Doc. 12 at 4-5.]

20

I agree with Elliott that at the motion to dismiss stage, the Court cannot consider foreclosure counsel's letters without converting the motion to dismiss into a motion for summary judgment.  As noted above, the Court can consider material beyond complaint and its attachments on a motion to dismiss if the material is referred to in the complaint, it is central to the plaintiff's claims, and there is no dispute as to its authenticity.  *See Brooks*, 116 F.3d at 1368.  A document is central to the plaintiff's case if the plaintiff would have to offer the document to prove his case.  *See Lockwood v. Beasley*, 211 F. App'x 873, 877 (11th Cir. 2006).  Here, Elliott does not refer to the purported foreclosure notices and letters from SLS in her complaint—indeed, she contends that SLS never provided them.  Nor can it be said that the notices are "central" to Elliott's claims since she does not have to offer the notices to prove her case.  *See Farson v. Carrington Mortg. Servs., LLC*, No. 8:13-CV-2289-T-33TGW, 2013 WL 5705565, at *3 (M.D. Fla. Oct. 18, 2013) (concluding that defendant's acknowledgement and response to a qualified written request was not central to RESPA and TILA claims since plaintiff could have brought the same claims regardless as to whether defendant had responded at all).  In addition, she disputes the authenticity of the documents themselves, and SLS makes no attempt to

authenticate by way of declaration or affidavit.  [Doc. 22 at 7.]  I therefore sustain Elliott's objection to the Court's consideration of the purported notices attached as Exhibit K to SLS's motion to dismiss.

SLS alternatively argues that regardless of whether Elliott received statutory notice, her wrongful foreclosure claim fails because she has not sufficiently alleged that the lack of notice caused her alleged damages.  [*Id.* at 13-15.]  SLS maintains that any damages are solely attributable to her failure to make proper loan payments, not the lack of notice.  [*Id.* at 14.]

It is a close call as to whether Elliott has sufficiently alleged causation, but I find that Elliott has met her burden to do so.  In each of the cases that SLS cites as examples of where causation has not been sufficiently pleaded, there was no dispute that the borrower was in default.  Here, there is an argument that can be made that Elliott reinstated the Loan as of May 30, 2013.  And although she made no additional payments after May 30, 2013, she has alleged that she repeatedly contacted Chase and then SLS in vain attempt to learn how much she owed on the loan, and that Chase and SLS either failed or refused to provide the necessary information to her.  [Doc. 2 at ¶¶ 41-46.]  She has also alleged that she told SLS that she had sufficient funds to reinstate the loan.  [*Id.* ¶ 44.]  Moreover, under the

terms of the Security Deed, she had up to five days before the foreclosure sale to reinstate the mortgage.  Taking as true that Elliott was willing, ready, and able to cure default, and taking as true that she did not receive notice of the foreclosure, it is plausible that proper notice might have enabled her to take action to cure the default.  Ultimately, Elliott will have to come forward with evidence to support causation, but at this point, I find that that is an issue that would be better addressed at summary judgment.[3]

### c.   Elliott Cannot Predicate a Wrongful Foreclosure Claim on the Alleged Failure to Pay the Excess Proceeds.

Elliott next argues that her wrongful foreclosure claim should be allowed to proceed because she has alleged that SLS "improperly distributed her surplus proceeds."  [Doc. 14 at 19-20.]  Elliott's claims based on the alleged "improper" distribution of the excess proceeds are based on two purported errors:  (1) that

---

[3] Elliott also argues that she has alleged that SLS failed to cooperate with her efforts to save her home from foreclosure, including not providing the reinstatement amount to her.  [Doc. 14 at 20; *see also* Doc. 2 ¶¶ 44-46.]  SLS replies that it did provide reinstatement information to Elliott on June 24, 2013, and attaches a letter dated June 24, 2013, from SLS to Elliott that advised her that the total reinstatement amount was $6,444.68.  [Doc. 16 at 6; 16-1 (June 24, 2013 letter).]  The Court will not consider the June 24, 2013 letter as it is outside the complaint and its authenticity is in dispute.

23

SLS failed to pay the excess proceeds to her immediately and (2) that SLS miscalculated the amount of the excess proceeds.  Even accepting the factual allegations of the Amended Complaint as true, I am not persuaded that Elliott can premise a wrongful foreclosure claim on the alleged miscalculation or failure to disburse proceeds from the foreclosure.  Elliott relies on *Decatur Investments Co. v. McWilliams*, to support her theory that a creditor's mishandling of excess proceeds from a foreclosure sale can give rise to a wrongful foreclosure claim. 162 Ga. App. 181, 181 (1982).  But that case merely recognizes that the manner in which the lender handles the proceeds from a foreclosure sale may justify the award of punitive damages where the lender wrongfully foreclosed.  It does not stand for the proposition that alleged misapplication of proceeds from a foreclosure sale can give rise to a separate wrongful foreclosure claim.  My own research has found no other case that recognizes that alleged mishandling of proceeds after the foreclosure sale has occurred—that is, after the borrower's interest in the collateral has been extinguished—constituted a wrongful foreclosure.  Accordingly, I reject Elliott's theory that the misapplication or miscalculation of proceeds alone could give rise to a wrongful foreclosure claim. As discussed below, to the extent that Elliott has a viable claim for the alleged

24

failure to pay the excess proceeds promptly or calculate them correctly, that is a matter of contract law governed by the Security Deed.   Accordingly, I recommend that Elliott's wrongful foreclosure claim be dismissed to the extent that it is premised on SLS's alleged miscalculation or mishandling of the proceeds of the foreclosure sale.

### d.      Summary

In sum, I **RECOMMEND** that the Court deny SLS's motion to dismiss with respect to Count I of the Amended Complaint, except that Elliott's wrongful foreclosure claim based on the alleged miscalculation or mishandling of proceeds be dismissed with prejudice.

### 2.      Breach of Contract (Count II)

Elliott premises her breach of contract claim on four alleged breaches:  (1) that SLS failed to recognize that Elliott reinstated the Loan; (2) that SLS failed to provide certain pre-foreclosure notices to Elliott; (3) that SLS failed to notify Elliott of the foreclosure until after it occurred; and (4) that SLS failed to properly distribute the excess proceeds.

Under Georgia law, a plaintiff "has the burden of pleading and proving the existence of a valid contract by showing that there are 'parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the

contract, and a subject matter upon which the contract can operate.'" *Eastview Healthcare, LLC v. Synertx, Inc.*, 296 Ga. App. 393, 398-99 (2009).  Once the existence of a contract is established, a plaintiff may only recover damages for breach of contract by demonstrating: (1) plaintiff's performance of the contract, (2) defendant's breach of the contract, and (3) the breach caused the plaintiff harm.  *Jones v. Cent. Builders Supply Co.*, 217 Ga. 190, 195-96 (1961) (citations omitted).  The essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom. *TDS Healthcare Sys. Corp. v. Humana Hosp. Ill., Inc.*, 880 F. Supp. 1572 (N.D. Ga. 1995).  A plaintiff asserting a breach of contract claim must also allege and identify a particular contractual provision that the defendants violated.  *See Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1370 (N.D. Ga. 2006) ("Because [plaintiff] cannot point to any contractual provision that [defendant] breached ... [plaintiff] cannot state a claim for breach of contract based on these allegations.") (citing *Adkins v. Cagle Foods JV, LLC*, 411 F.3d 1320, 1327 (11th Cir. 2005)).

### a. Breach of Contract Based on Failing to Recognize Reinstatement of the Loan and Providing Preforeclosure Notice

SLS argues that Elliott's breach of contract claim based on SLS's alleged failure to recognize that she reinstated the loan or to provide notice of foreclosure fails for the same reasons as her wrongful foreclosure claim. As explained above, those are matters are more appropriately dealt with on summary judgment; therefore, I recommend that Elliott's breach of contract claim be allowed to proceed.

### b. Breach of Contract Based on Failing to Provide Post-Foreclosure Notice

Elliott's assertion that SLS failed to provide *post*-foreclosure notice does not give rise to a breach of contract claim, as no provision of the Security Deed requires SLS to notify Elliott that the Property was foreclosed upon. [Doc. 5-1 at 16.] In the absence of a contractual provision requiring post-foreclosure notice, there can be no breach of contract. Accordingly, Elliott's breach of contract claim should be dismissed to the extent that it is based on SLS's alleged failure to provide her notification of the foreclosure after it has occurred.

27

### c.   Breach of Contract Based on Distribution of Excess Proceeds

Elliott alleges that SLS breached the terms of the Security Deed by "fail[ing] to properly distribute the Excess Proceeds" of the foreclosure sale to her.  [Doc. 2 ¶ 114.]  As discussed above, Elliott contends that SLS failed to "properly distribute" those funds in two ways:  (1) by not "immediately" distributing the funds to her following the foreclosure sale; and (2) by not paying the full amount of the proceeds to her.  I find that Elliott has alleged facts sufficient to survive a motion to dismiss and that the timing of the payment of the excess proceeds and the manner in which they were calculated are more appropriately addressed at summary judgment.

Under Georgia law "[t]ime is not generally of the essence of a contract; but, by express stipulation or reasonable construction, it may become so." O.C.G.A. § 13-2-2(9).  "If time is not of the essence, either expressly or by construction, the party has a reasonable time in which to perform."  *Torgesen v. Torgesen*, 274 Ga. App. 298, 300 (2005).  "[W]hat is a reasonable time is a matter of fact, to be determined by a jury or other factfinder under all the circumstances of the case."  *Id.* at 301 (citation omitted); *see also IH Riverdale, LLC v.*

28

*McChesney Capital Partners, LLC*, 280 Ga. App. 9, 14 (2006) ("Generally, what is reasonable time is a question of fact for the jury.").

Here, the Security Deed does not set a deadline by which excess proceeds from a foreclosure sale must be distributed, nor does it contain a "time is of the essence" provision. The applicable provision of the Security Deed simply provides as follows:

> Lender shall apply the proceeds of the [foreclosure] sale in the following order: (a) to all expenses of the sale, including but not limited to, reasonable attorney's fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

[Doc. 1-1 at 58.] Therefore, SLS had a "reasonable time" in which to distribute the excess proceeds. *See Torgensen*, 274 Ga. App. at 300.

The question at this stage of the proceedings is whether Elliott has sufficiently alleged that SLS did not perform its obligation to pay out the excess proceeds in a "reasonable time." SLS argues that Elliott has not done so because she merely alleges that she was entitled to "immediate" and "instanter" distribution of the excess proceeds. [Doc. 5-1 at 18.] SLS goes on to argue that Elliott has attempted to shift her theory in her response brief to an argument that SLS did not pay the proceeds to her in a "reasonable" amount of time, and that

29

the only issue before the Court is whether SLS was required to pay the proceeds out "immediately." [Doc. 16 at 11.] I find SLS's argument unconvincing. True, Elliott does allege that the funds should have been paid to her "immediately" or "instanter," but it is equally clear that Plaintiff also contends that she should have been paid the proceeds before she filed the Cherokee County Action in June 2014, over nine months after the foreclosure sale.[4] Keeping in mind the Court's role on a motion to dismiss, I conclude that Elliott's breach of contract premised on the timing of the payment of the proceeds should be allowed to proceed.

Turning next to Elliott's contention that SLS improperly calculated the amount of excess proceeds, this is a close call, but I conclude that Elliott's claim should be allowed to proceed. Elliott alleges that the amount of the excess proceeds should be calculated by subtracting the principal balance of her loan from the proceeds of the sale. [Doc. 2 ¶ 54, 55; Doc. 1-1 at 73.] The Security Deed contradicts this allegation. Paragraph 22 authorizes the Lender "to collect

---

[4] SLS further argues that as a practical matter, it would be impossible to immediately distribute proceeds from a foreclosure because institutional investors such as Fannie Mae, Freddie Mac, and Chase must account for foreclosure proceeds before any excess can be declared. [Doc. 5-1 at 18 n.12.] That all may be true, but those are facts outside the pleadings and cannot be accepted as true at this stage in the proceedings.

all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence" and to apply the proceeds to all expenses of the sale, including, but not limited to, reasonable attorneys' fees and to all sums secured by the instrument. [Doc. 1-1 at 58.]  Plainly, Elliott's method of calculating the excess proceeds is deeply flawed.  But it is not clear if that is Elliott's sole theory as to why the calculation is erroneous.  The Amended Complaint alleges that SLS has never calculated or detailed the amount of the excess proceeds [*see* Doc. 2 ¶ 57], and that the excess proceeds exceed the amount that SLS deposited into the registry of the Cherokee County Superior Court [*see id.* ¶ 70].  The allegation of miscalculation, in and of itself, is sufficient for SLS to understand the nature of the claim against it.  This issue is better addressed at summary judgment where the Court can consider the evidentiary record, rather than just the pleadings.

### d.    Summary

In sum, I **RECOMMEND** that Elliott's breach of contract claim be allowed to proceed to the extent that it is based on (1) whether Elliott reinstated the loan; (2) whether Elliott was provided notice of foreclosure; and (3) whether SLS properly distributed the excess payments in a timely manner.  I further

31

**RECOMMEND** that Elliott's breach of contract claim based on the SLS failure to provide post-foreclosure notice to Elliott be **DISMISSED** with prejudice.

### 3.   Breach of Implied Duty of Good Faith and Fair Dealing (Count III)

Under Georgia law, "[e]very contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement," but "[t]he law is clear that there exists no independent cause of action for breach of good faith and fair dealing outside of a claim for breach of contract." *Cone Fin. Grp., Inc. v. Emp'rs Ins. Co. of Wausau*, No. 7:09-CV-118 (HL), 2010 WL 3221831, at *2 (M.D. Ga. Aug. 13, 2010); *see also Chung v. JPMorgan Chase Bank, N.A.*, 975 F. Supp. 2d 1333, 1344 (N.D. Ga. 2013) ("Breach of the implied covenant of good faith and fair dealing cannot be an independent claim.").  Georgia law does not recognize an independent cause of action for a party's alleged failure to act in good faith.  *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990); *OnBrand Media v. Codex Consulting, Inc.*, 301 Ga. App. 141, 147 (2009).

SLS's sole argument for dismissal of Count III is that Elliott's breach of contract claim fails, and therefore, her claim for a breach of the implied duty of good faith and fair dealing also fails.  [Doc. 5-1 at 18-19.]  In light of my

conclusion that Elliott's breach of contract claim survives summary judgment, SLS's argument fails.  I therefore **RECOMMEND** that SLS's motion to dismiss as it relates to Elliott's breach of the implied duty of good faith and fair dealing be **DENIED.**

### 4.   Intentional and Negligent Infliction of Emotional Distress (Count IV)

#### a.   Intentional Infliction of Emotional Distress

To state a claim for intentional infliction of emotional distress under Georgia law, a plaintiff must establish (1) intentional or reckless conduct; (2) extreme and outrageous conduct; (3) a causal connection between the alleged conduct and the emotional distress; and (4) severe emotional injury.  *Jarrard v. United Parcel Serv., Inc.*, 242 Ga. App. 58, 59 (2000).  "The defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Blue View Corp. v. Bell*, 298 Ga. App. 277, 278 (2009).  "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law."  *Id.*  "The law intervenes only where the distress inflicted is so severe that no reasonable man

could be expected to endure it." *Bridges v. Winn-Dixie Atlanta, Inc*., 176 Ga. App. 227, 230 (1985).

SLS summarily contends that the infliction of emotional distress claims fail because Elliott has not alleged conduct by SLS that was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." [Doc. 5-1 at 20 (quoting *Frank v. Fleet Fin., Inc. of Ga.*, 238 Ga. App. 316, 317-18 (1999)).] Elliott responds that she has alleged facts that show that SLS's conduct is extreme, including (1) that she had funds to reinstate the Loan and discussed reinstating the Loan with SLS to no avail and (2) SLS foreclosed on the Property; and (3) SLS refused to give her the excess proceeds for years. [Doc. 14 at 25-26.]

I recognize that a plaintiff must meet a high standard to prevail on an intentional infliction of emotional distress claim, and that "[s]harp or sloppy business practices, even if in breach of contract, are not generally considered as going beyond all reasonable bounds of decency as to be utterly intolerable in a civilized community." *See United Parcel Serv. v. Moore*, 238 Ga. App. 376, 377 (1999) But at this stage of the proceedings, I must accept as true the allegation that SLS took steps to engineer the foreclosure, including refusing to provide

34

reinstatement figures to Elliott when she asked for them and failing to provide pre-foreclosure notice.  This is arguably similar to the facts in *Mbigi v. Wells Fargo Home Mortgage*, 336 Ga. App. 316, 326 (2016), where Mbigi, the borrower, alleged that his lender engineered a default on the loan by instructing him not to pay, lied about why it could not accept payment, and improperly refused to accept his attempt to pay the loan in full.  On those facts, the Georgia Court of Appeals held that the lender's conduct was sufficiently extreme and outrageous to support an intentional infliction of emotional distress claim.  *Id.* While the facts here may not be exactly the same, *Mbigi*, at the very least, stands for the proposition that allegations of deliberate malfeasance in the lead up to a foreclosure may sufficiently support an intentional infliction of emotional distress claim.  Accordingly, I **RECOMMEND** that SLS's motion to dismiss Elliott's intentional infliction of emotional distress claim be **DENIED**.

### b.    Negligent Infliction of Emotional Distress

Under Georgia law, "[i]n claims alleging negligent conduct, emotional distress damages are allowed only where there is some impact on the plaintiff, and that impact must be a physical injury."  *Crayton v. JPMorgan Chase Bank, N.A.*, No. 1:16-CV-577-TWT, 2016 WL 7231663, at *3 (N.D. Ga. Dec. 14, 2016) (citation omitted); *see also Coon v. Med. Ctr., Inc.,* 300 Ga. 722, 734-35 (2017)

(reaffirming physical impact rule for claims of negligent infliction of emotional distress).  "[A]n intervening criminal act of a third party, without which the injury would not have occurred, will also be treated as the proximate cause of the injury thus breaking the causal connection between the defendants' negligence and the injury unless the criminal act was a reasonably foreseeable consequence of the defendants' conduct." *Davis v. Blockbuster, Inc.*, 258 Ga. App. 677, 679 (2002).

SLS argues that Elliott's negligent infliction of emotional distress claim fails because she has not alleged a claim for negligence.  Her claims are all based on alleged violations of contractual duties, which do not give rise to tort causes of action.

Elliott counters that she need only show that she suffered an impact resulting in physical injury or pecuniary loss due to wrongful conduct.  [Doc. 14 at 26.]  Here, she alleges that she was physically assaulted while she was homeless, which was a direct result of SLS's wrongful foreclosure and the improper retention of surplus funds.  [*Id*. at 26-27 (citing Doc. 2 ¶ 83).]

I am not persuaded that Elliott can state a claim for negligent infliction of emotional distress for at least two reasons.  First, under Georgia law, "'a borrower and its secured lender have no relationship beyond that imposed by [the] contract'

36

between them and . . . Georgia's foreclosure statutes do not create a duty supporting a claim for negligence." *Sibley v. Nat'l City Mortg. Co.*, No. 1:12-CV-305-SCJ-JFK, 2013 WL 12097954, at *10 (N.D. Ga. July 24), *report and recommendation adopted*, 2013 WL 12098962 (N.D. Ga. Aug. 23, 2013), *aff'd*, 560 F. App'x 825 (11th Cir. 2014). Thus, a borrower who contends that the lender breached the terms of their contract or violated a statutory duty may not bring a negligence claim. Since a claim for negligent infliction of emotional distress presumes some underlying negligent act, Elliott's claim fails as a matter of law.

Second, even if Elliott could assert a viable negligence claim, the First Amended Complaint is devoid of facts that plausibly suggest that the intervening criminal act of a third party was reasonably foreseeable to SLS. Specifically, she alleges no facts to suggest that SLS should have reasonably foreseen that she would be attacked while living in her car after the party that purchased the Property evicted her.

Accordingly, I **RECOMMEND** that Elliott's negligent infliction of emotional distress claim be **DISMISSED WITH PREJUDICE**.

37

### 5.      Fraud and Negligent Misrepresentation (Counts V and VI)

Elliott alleges that before SLS foreclosed on the Property it made the following false and misleading statements to Elliott:  (1) that she was still in default after her reinstatement of the Loan; (2) that it would contact her "about a payoff or other amounts due"; (3) that Elliott was represented by counsel; and (4) that she must use certified funds to reinstate the Loan.  [Doc. 2 ¶ 135.]  Elliott additionally alleges that after the foreclosure, SLS misrepresented in a September 4, 2013 letter that that Elliott could modify the Loan.  [*Id.*]  SLS argues that none of the foregoing statements can, as a matter of law, support Elliott's fraud and negligent misrepresentation claims.  [Doc. 5-1 at 23-29.]

Under Georgia law, the tort of fraud has five essential elements: (1) a false representation or omission of a material fact; (2) scienter; (3) intention to induce the party claiming fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages.  *Lehman v. Keller*, 297 Ga. App. 371, 372-73 (2009).  A claim for negligent misrepresentation has essentially the same elements as claims for fraud, the only difference being whether the defendant knowingly or negligently made the misrepresentations.  *Am. Casual Dining*, 426 F. Supp. 2d at 1365-66.  The elements of a negligent misrepresentation claim are: (1) the defendant negligently supplied false information to foreseeable persons, known or unknown; (2) such

persons reasonably relied upon that information; and (3) economic injury proximately resulted from that reliance.

SLS's statement that Elliott was in default despite her alleged reinstatement is not actionable. At the time SLS made the statement, Elliott knew that Chase had rejected her tender of $4,000 and that she believed that it was improper. She therefore could not have been induced to take or refrain from taking any action as a result of the statement.

Likewise, SLS's statement that it would contact Elliott "about a payoff or other amounts due" is not actionable because Elliott does not allege facts that plausibly suggest that she took or refrained from taking any action based on that statement. Citing *Stewart v. SunTrust Mortgage, Inc.*, 331 Ga. App. 635 (2015), Elliott argues that SLS made false statements to her knowing that she would rely on them to not undertake other efforts to protect the Property from foreclosure. *Stewart* is distinguishable, however, because in that case, the lender promised to suspend foreclosure proceedings, whereas here, SLS is not alleged to have made a promise not to proceed with foreclosure.

Next, SLS's purported statement to Elliott that she was represented by counsel is not actionable because Elliott necessarily would know whether the

statement was true or not, and therefore, she could not have reasonably relied on the statement to her detriment.

Next, the alleged statement that it demanded payment in certified funds also is not actionable because Elliott alleges in that *Chase* made this statement—not SLS. Specifically, she alleges that "When Chase returned Ms. Elliott's check, it also falsely told her that the check was being returned because it was not in certified funds." [See Doc. 2 ¶ 38 (emphasis added).] In any event, even if SLS had made the statement, Elliott has not alleged facts sufficient to show that she relied on it to her detriment.

Finally, Elliott's fraud claims based on statements in SLS's post-foreclosure letter regarding a loan modification is not actionable because the letter does not promise a modification of her loan and because Elliott does not allege that she relied on the statement to her detriment.

For these reasons, I **RECOMMEND** that Elliott's fraud and negligent misrepresentation claims be **DISMISSED WITH PREJUDICE**.[5]

---

[5] Elliott argues that if the Court finds that her fraud claim is not properly pleaded, the Court should direct her to replead the complaint to provide a more definite statement. [Doc. 14 at 30.] There is no indication, however, that repleading the fraud claim would cure the defects in the First Amended Complaint.

### 6.     Civil Theft By Deception (Count VII)

In Count VII, Elliott alleges that SLS committed civil theft by deception by concealing the foreclosure from her so it could retain the excess proceeds from the foreclosure.  [Doc. 2 ¶¶ 148-55.]  Specifically, Elliott contends that on the day after the foreclosure, SLS sent her a letter misrepresenting that the loan was still in effect and had not been foreclosed, which caused her to believe that the still owned the Property.  [*Id.* ¶¶ 148-52.]  Since she did not have knowledge of excess proceeds from the foreclosure sale, SLS obtained and retained possession of the funds "during this period" and improperly benefited by earning interest on the funds.  [*Id.* ¶¶ 153-55.]

O.C.G.A. § 51-10-6 allows the "owner of personal property shall be authorized to bring a civil action to recover damages from any person who willfully damages the owner's personal property or who commits a theft as defined in Article 1 of Chapter 8 of Title 16 involving the owner's personal property."  Georgia defines criminal theft by deception as "obtain[ing] property by any deceitful means or artful practice with the intention of depriving the owner of the property."  O.C.G.A. § 16-8-3(a).  One way in which a person deceives another is by creating or confirming another's impression of an existing fact or

41

past event which is false and which the person knows or believes to be false. O.C.G.A. § 16-8-3(b)(1).

Elliott's claim fails because SLS did not use the letter to obtain by "deceitful means or artful practice" the proceeds of the foreclosure sale. SLS obtained the proceeds of the foreclosure sale by selling the Property at foreclosure on September 3, 2013, **before** Elliott had received the September 4 letter. Accordingly, the September 4 letter could not have been the means by which SLS obtained the proceeds of the foreclosure sale. Put differently, had Elliott never received the September 4 letter, SLS would still have obtained the proceeds of the foreclosure.

Moreover, Elliott does not point to a single statement in the letter that was, in fact, inaccurate. The letter simply advised her that she "may be eligible" for assistance in making her mortgage loan payments. [Doc. 1-1 at 80.] The letter also required her to return paperwork to SLS in order for SLS to determine if she would be eligible for assistance. [*Id.*] The letter did not, as Elliott alleges, advise her that her loan remained active and that foreclosure had not occurred.[6] Thus,

---

[6] SLS also contends that Elliott's civil theft by deception claim fails as a matter of law because she knew that the foreclosure sale would—and did—occur on September 3, 2013. [Doc. 5-1 at 30.] In support, SLS relies on

there is no plausible allegation that the September 4 letter communicated any false statement to Elliott.

For these reasons, I **RECOMMEND** that Elliott's claim for Civil Theft by Deception be **DISMISSED WITH PREJUDICE**.

### 7.    Breach of Legal Duty (Count VIII)

Elliott asserts a claim for breach of legal duty based on SLS's failure to timely distribute the excess proceeds to her.  [Doc. 2 ¶¶ 159-65.]  Specifically, Elliott alleges that O.C.G.A. § 44-14-90 imposed a duty on SLS to timely distribute the excess proceeds to her, and that she was required to take no action for the funds to be distributed to her.  [*Id.* ¶¶ 160, 162.]

SLS argues that it complied with O.C.G.A. § 44-14-90 when it tendered what it believed to be the excess proceeds into the registry of the Cherokee County Superior Court.  [Doc. 5-1 at 31.]  SLS also points out that Elliott has already received those funds.  [*Id.*]  SLS maintains that nothing in O.C.G.A. § 44-14-90 required it to pay the funds immediately after the foreclosure.  [*Id.*]

---

correspondence from its foreclosure counsel to Elliott, which is attached as Exhibit K to the motion to dismiss.  [*See* Doc. 5-12.]  As discussed above, the Court cannot consider those materials without converting the motion to dismiss to a motion for summary judgment.  Therefore, I do not consider that argument at this stage of the proceedings.

Elliott responds that SLS's argument is "strained and not supported by any legal authority." [Doc. 14 at 31.]  She again points out that she did not receive any of the excess proceeds for nearly two and a half years after the foreclosure and that the SLS miscalculated the excess funds.  [*Id.*]

On reply, SLS insists that Elliott "cannot be allowed to feign the existence of some unpaid Excess Proceeds by ignoring other amounts which Defendant could collect in connection with the foreclosure." [Doc. 16 at 18.]  SLS argues that Elliott's assertion that there are excess proceeds that remain unpaid is implausible.  [*Id.*]

At oral argument, I raised whether O.C.G.A. § 44-14-190 applies to the distribution of proceeds in this case because the statute can be read to apply only to judicial foreclosures on mortgages.  The statute provides:

> The money arising from the sale of mortgaged property ***sold under the regulations prescribed in this part*** shall be paid to the person foreclosing the mortgage unless claimed by some other lien which by law has priority of payment over the mortgage; and, when there is any surplus after paying off the mortgage and other liens, the surplus shall be paid to the mortgagor or his agent.

O.C.G.A. § 44-14-190 (emphasis added).  The "part" referenced in the statute is applicable to judicial foreclosure upon mortgages, not security deeds.  *See* O.C.G.A. §§ 44-14-180 through 44-14-191.  "Where the plain language of the

44

statute is clear and susceptible to only one reasonable construction, we must construe the statute according to its terms.  However, where there is ambiguity, the entire legislative scheme, including its history, may be examined." *You v. JP Morgan Chase Bank*, 293 Ga. 67, 71 (2013) (citations omitted).  The plain language of O.C.G.A. § 44-14-190 refers only to judicial foreclosure sales, not nonjudicial foreclosure sales.

At oral argument, Elliott's counsel pointed out that Georgia appellate courts and other judges on this Court have assumed, without further explanation, that O.C.G.A. § 44-14-190 applies to the distribution of proceeds from nonjudicial foreclosure sales.  *See, e.g., Powell v. Bank of Am., N.A.*, No. 1:13-CV-03049-RWS, 2014 WL 2118821, at *3 (N.D. Ga. May 21, 2014).  My own research indicates that the only case in which a judge expressly considered whether the statute applied in nonjudicial foreclosures was *Love v. Bank of America, N.A.,* No. 1:13-CV-01617-RWS, 2014 WL 1292652, at *4 (N.D. Ga. Mar. 31, 2014).  In *Love,* Judge Story found that the plain language O.C.G.A. § 44-14-190 made it applicable only in the context of a judicial foreclosure, and not to a nonjudicial foreclosure.

I agree with the reasoning in *Love.*  By its terms, the statute applies only to judicial foreclosures.  Moreover, the Georgia Court of Appeals has recognized that the "right to a distribution of excess proceeds from the foreclosure sale is governed by the security deed," which further supports the conclusion that the security deed, rather than a statute, governs how proceeds should be distributed following a nonjudicial foreclosure sale.  *See Riverview Condo. Ass'n v. Ocwen Fed. Bank, FSB*, 285 Ga. App. 7, 8 (2007).  Accordingly, Elliott's claim based on a violation of O.C.G.A. § 44-14-190 should be dismissed.

Finally, Elliott states in her response that SLS "admits that O.C.G.A. § 44-14-190 applies to its handling of [her] foreclosure proceeds."  [Doc. 14 at 31.]  I am not convinced that SLS "admitted" anything of the sort.  Rather, it simply assumed, albeit incorrectly, that O.C.G.A. § 44-14-190 applied to the foreclosure at issue in this case.  The bottom line is that that statute is inapplicable to a nonjudicial foreclosure sale and that the terms of the Security Deed instead govern the distribution of proceeds from the foreclosure.

Accordingly, I **RECOMMEND** that Elliott's claim for breach of legal duty be **DISMISSED WITH PREJUDICE**.

### 8.    Conversion (Count IX)

Elliott asserts a state law claim for conversion based on SLS's failure to timely distribute the excess proceeds of the foreclosure sale and that SLS still has possession of some of the excess proceeds.

"Conversion is the unauthorized assumption and exercise of the right of ownership over personal property belonging to another which is contrary to the owner's rights."   *Reeves v. Edge*, 225 Ga. App. 615, 619 (1997) (citation omitted).  Under Georgia law, "[a] breach of contract does not, by itself, give rise to a cause of action in tort; and when the allegation that a tort was committed adds nothing of substance to the breach of contract claim, it is mere surplusage." *WESI, LLC v. Compass Envtl., Inc.*, 509 F. Supp. 2d 1353, 1361 (N.D. Ga. 2007) (citing *Faircloth v. A.L. Williams & Assocs., Inc.*, 206 Ga. App. 764, 766 (1992)).

SLS moves to dismiss the conversion claim on the sole basis that Elliott did not make a demand for the excess proceeds.  [Doc. 5-1 at 31-33.]  In support, SLS cites to an order entered in the Cherokee County Action dismissing Elliott's

conversion claim on the grounds that she did not demand the excess proceeds before filing suit.  [Doc. 5-1 at 32; Doc. 5-11.[7]]

Elliott responds that demand is not required when the holder of the assets converts the asset for its own use and exercises dominion and control over it. [Doc. 14 at 32.]  She contends she is not required to plead demand because she has pleaded facts that SLS commingled the funds and gave them to third parties. [*Id.*]  Citing *Powell v. Bank of Am., N.A.*, No. 1:13-CV-03049-RWS, 2014 WL 2118821, at *3 (N.D. Ga. May 21, 2014), Elliott contends that retaining funds

---

[7] Elliott moves to strike the copy of the Cherokee County Superior Court's order attached as Exhibit J to SLS's motion to dismiss on the grounds that it is a non-final order, has no bearing on the pending claims, and it is an "improper prop to influence the Court's consideration of its motion to dismiss."  [Doc. 12 at 4.] SLS counters that the order is a matter of public record, and that this court can take judicial notice of the document.  [Doc. 17 at 7.]  SLS has the better argument.  The Eleventh Circuit has recognized that a court may properly take judicial notice of court documents from a prior state court action without converting a motion to dismiss into a motion for summary judgment.  *See, e.g., Desisto v. City of Delray Beach*, 618 F. App'x 558, 560 (11th Cir. 2015) (taking judicial notice of court documents from prior state court action and holding that consideration of those documents did not convert motion to dismiss into motion for summary judgment); *Lozman v. City of Riviera Beach, Fla.*, 713 F.3d 1066, 1076 n.9 (11th Cir. 2013) (taking judicial notice of court documents from prior state eviction action on motion to dismiss).  This Court may therefore consider Exhibit J (which is docketed at Doc. 5-11), as well as the other documents filed in connection with the Cherokee County Action, without converting the motion to dismiss to a motion for summary judgment.

could support a claim for conversion.  She also cites *LaRoche Industries, Inc. v. AIG Risk Management, Inc.*, 959 F.2d 189, 192 (11th Cir. 1992), which recognizes the general proposition that "[i]f the bank misappropriates the depositor's money in such a way that the depositor loses the benefit of her funds, this could constitute conversion."

In general, "when someone comes into lawful possession of personal property . . . , in the absence of a demand for its return and a refusal to return the personal property, there is no conversion." *Taylor v. Powertel, Inc.*, 250 Ga. App. 356, 358 (2001).  But there is no requirement for a demand where the defendant "comes into possession of the property unlawfully, disposes of the property without authority and retains the proceeds."  *Williams v. Nat'l Auto Sales, Inc.*, 287 Ga. App. 283, 286 (2007).

Here, I cannot say that SLS initially came into possession of the proceeds of the foreclosure lawfully.  True, the Security Deed authorizes SLS to convey the Property and to distribute the proceeds of the sale [*see* Doc. 1-1 at 58]; however, Elliott has also alleged that SLS wrongfully exercised its right to foreclose.  Thus, when SLS conveyed the property at foreclosure, it may not have received the proceeds from that sale legitimately.  Accordingly, to state a claim for conversion

49

under Georgia law, Elliott was not necessarily required to demand the return of the proceeds.   Thus, I **RECOMMEND** that SLS's motion to dismiss the conversion claim be **DENIED**.

### 9.     Money Had and Received (Count X)

In Count X Elliott asserts an equitable claim for money had and received based on SLS's failure to disburse immediately the excess proceeds.  [Doc. 2 ¶ 181-188.]  "Under the common law doctrine of money had and received, recovery is authorized against one who holds unspecified sums of money of another which he ought in equity and good conscience to refund." *Taylor*, 250 Ga. App. at 359. "This theory applies only when there is no actual legal contract." *Baghdady v. Central Life Ins. Co.*, 224 Ga. App. 170, 171 (1996).

SLS argues that Elliott's money had and received claim fails because the parties' relationship was governed by the Security Deed, which is a legal contract under Georgia law.  [Doc. 5-1 at 33.]  Elliott responds that the claim survives dismissal because SLS has taken the position that her breach of contract claim fails as a matter of law.  [Doc. 14 at 34.]

Elliott misunderstands the law regarding this claim.  A claim for money had and received lies where there is a lack of a contract, not where there is a lack

50

of a **breach** of contract.  Here, there is no real dispute that the Security Deed governs the parties' relationship, and neither party challenges the validity or enforceability of the instrument.[8]

Accordingly, I **RECOMMEND** that Elliott's claim for money had and received be **DISMISSED WITH PREJUDICE**.

### 10.    Punitive Damages (Count XI) and Attorney Fees (Count XII)

SLS moves to dismiss Elliott's claims for punitive damages and attorney fees on the grounds that all other claims fail as a matter of law.  [Doc. 5-1 at 34.] In light of my conclusion that some of the claims survive dismissal, I cannot say as that as a matter of law, the remedies of punitive damages or attorney fees are unavailable to Elliott.[9]   I therefore **RECOMMEND** that SLS's motion be **DENIED** as to Elliott's demand for punitive damages and attorney fees.

---

[8] Elliott's reliance on *Bob Parrott, Inc. v. First Palmetto Bank*, 133 Ga. App. 447 (1974), is misplaced.  In that case, a subordinate lender asserted a claim for money had and received against the senior-position lender, which possessed surplus funds from a foreclosure.  *Bob Parrott*, 133 Ga. App. at 447-48.  There is no indication that there was a contract that governed the relationship between the lenders.

[9] As a technical matter, neither punitive damages nor attorney fees under O.C.G.A. § 13-6-11 are independent causes of action.  *See Franklin Credit Mgmt. Corp. v. Friedenberg*, 275 Ga. App. 236, 242 (2005) (stating that a claim for

## IV.   CONDITIONAL MOTION FOR LEAVE TO AMEND [Doc. 13]

Elliott moves for leave to amend the complaint to cure pleading defects. [Doc. 13.]  Elliott proposes seven examples of proposed amendments; however, none would change the outcome of the pending motion to dismiss.  Although Elliott notes that the proposed amendments are nonexhaustive, the Eleventh Circuit has repeatedly cautioned that "[a] motion for leave to amend should either set forth the substance of the proposed amendment or attach a copy of the proposed amendment."  *Long v. Satz*, 181 F.3d 1275, 1279 (11th Cir. 1999) (citing *Wisdom v. First Midwest Bank*, 167 F.3d 402, 409 (8th Cir. 1999) ("[P]arties should not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim.")).   Having considered the proposed amendments that Elliott identified in her motion and at oral argument, I readily conclude that she has not shown that amendment is

---

punitive damages is not an independent cause of action); *Lamb v. Salvage Disposal Co. of Ga.*, 244 Ga. App. 193, 196 (2000) ("O.C.G.A. § 13-6-11 does not create an independent cause of action but merely permits in certain limited circumstances the recovery of the expenses of litigation incurred as an additional element of damages.").  While asserting separate causes of action for those remedies is unnecessary, it makes little practical difference whether they are set forth in separate counts.  And since SLS does not move to dismiss those claims on that technical basis, I decline to recommend that the Court do so either.

warranted under these circumstances.  Accordingly, Elliott's Motion to Amend is **DENIED**.

## V.   SLS's RULE 41 MOTION [Doc. 26]

On April 13, 2017, more than three months after this case was removed to this Court and after Elliott's motion to dismiss had been fully briefed, SLS moved to stay all proceedings pending payment of costs and fees under Fed. R. Civ. P. 41(d) because this action is a renewal of an earlier lawsuit that Elliott filed in state court.  [Doc. 26.]  Specifically, SLS seeks to recoup from Elliott $78,140 in attorney fees and costs, which it contends it incurred for work that SLS performed in the Cherokee County Action that cannot be reused in this case.  [*Id.* at 14.] Those expenses include fees related to:

> (1)    SLS's motion to dismiss and motion for judgment on the pleadings;
>
> (2)    amended pleadings;
>
> (3)    settlement and mediation;
>
> (4)    hearings;
>
> (5)    communications and discovery with other defendants;
>
> (6)    scheduling and docketing;
>
> (7)    filing a motion to compel and communications with Elliott's counsel; and

53

(8)   costs.

SLS argues that Elliott is asserting the same claims in this action as in the Cherokee County Action, including some claims on which she already lost, and that forcing this Court to "start from scratch" would be a "waste of litigant and judicial resources." [Doc. 26 at 13.] SLS also maintains that Elliott dismissed the case to delay the case and allow her to forum shopping. [Id. at 15.]

Elliott opposes the motion. [Doc. 36.] She does not contest that she dismissed and re-filed the lawsuit for tactical reasons, including her frustration with the pace at which the Cherokee County Court would rule on pending motions and that there were discovery disputes that had developed that could not be resolved before the end of the summary judgment briefing period. [*Id.* at 9-10, 13.] She nevertheless asserts that it would be inequitable to force her to reimburse SLS for its attorney fees and expenses. She maintains that SLS reaped substantial benefit from the issues on which the Cherokee County Court ruled, and she represents that she will not re-assert those arguments and claims here. [*Id.* at 13.] She also points out that much of the work in the Cherokee County Action can be reused in this case, including discovery. [*Id.*] SLS has filed a reply. [Doc. 38.]

54

Rule 41(d) authorizes the Court to award a party some or all of its costs of a previously-dismissed action and to stay the re-filed proceeding "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant." The purpose of the rule is to "promote[] the just, speedy and inexpensive determination of every action by deterring plaintiffs from changing forums mid-litigation and forcing a new court to start from scratch, thus wasting litigant expenses and judicial resources." *Cadle Co. v. Beury*, 242 F.R.D. 695, 698 (S.D. Ga. 2007). Even where the plaintiff has not engaged in forum shopping or acted in bad faith, a court may award costs in order to prevent prejudice to the defendant." *Wishneski v. Old Republic Ins. Co.*, No. 5:06-CV-148-OC-10GRJ, 2006 WL 4764424, at *2 (M.D. Fla. Oct. 10, 2006). In other words, there are two interests at play: (1) to discourage forum shopping and (2) to minimize prejudice to a defendant who is forced to incur expenses defending two separate actions. *See Powers v. Chase Bankcard Servs., Inc.*, No. 2:10-CV-332, 2010 WL 4982148, at *2 (S.D. Iowa Dec. 1, 2010).

First, I consider the interest of minimizing prejudice to SLS. SLS represents that it seeks only to recover costs and fees that it incurred but would

have no use in this case.  But SLS has not pointed to any expense that it would have to duplicate in this case because of previous work being unusable.    Take, for example, the motion to dismiss that SLS filed in the Cherokee County Action. That motion was fully litigated, SLS prevailed, and Elliott has represented that she will not reassert those claims here.  I see no good reason for SLS to recoup its fees and costs related to that motion, especially since SLS will enjoy the benefit of that ruling in this action.  Another example is the motions that SLS filed but on which the Cherokee County Court did not issue a ruling before Elliott dismissed the case.  If SLS is correct that the claims in this case are identical to the claims in the Cherokee County Action, then SLS should be able to recycle that work here. *See Wolf v. Pac. Nat'l Bank, N.A.*, No. 09-21531-CIV, 2010 WL 1462298, at *4 (S.D. Fla. Mar. 18, 2010) ("It is well understood that an award of fees for purposes of Rule 41 should not award such fees when the work involved will prove necessary for the ultimate resolution of the second-filed action."), *report and recommendation adopted*, 2010 WL 1489995 (S.D. Fla. Apr. 13, 2010).  Yet another example is the failed mediations.  Elliott's dismissal of the Cherokee County Action has no connection whatsoever to those failed mediations.  The bottom line is that SLS has not persuaded me that any of the categories of

expenses it identifies in its motion would not have been incurred had Elliott not voluntarily dismissed the Cherokee County Action.  Thus, it would not serve to protect SLS from prejudice to award those costs.

Turning next to the deterrent interest of Rule 41(d), there is no legitimate dispute that Elliott dismissed the Cherokee County Action and re-filed this action alleging identical claims to gain a tactical advantage in her suit against SLS. Elliott concedes that she was frustrated with the pace at which the Cherokee County Court was handling pending motions and that she also felt that she needed to buy more time to deal with discovery disputes that arose late in the discovery period.  I do not condone Elliott's eleventh-hour choice to dismiss the Cherokee County Action, and I am troubled that Elliott dismissed and re-filed this action to gain a tactical advantage at such a late stage in the proceedings.

But SLS also bears some blame for the delay in this case.  It is somewhat incongruous for SLS to complain that Elliott has engaged in forum shopping when it was SLS that removed this case to federal court, which was not Elliott's choice of forum.  In addition, even though discovery in this case is all but complete, SLS chose to file a motion to dismiss under Rule 12(b)(6) after it removed the case rather than proceeding to summary judgment.  Making matters

worse and despite clear authority, SLS repeatedly attached documents to the motion and made arguments that this Court could not consider on a Rule 12(b)(6) motion.  Then, only after the motion to dismiss and the ancillary motions to strike and for leave to amend had been fully briefed and submitted to the Court for resolution, did SLS file its Rule 41(d) motion.  SLS's tactical decision to file a Rule 12(b)(6) motion forced Elliott (and her counsel) to invest further time, money, and energy into this case, and it has further prolonged this case, which has now been pending for nearly three years.  In my view, having to litigate to SLS's motion to dismiss and its tardy Rule 41 Motion is punishment enough for Elliott and her counsel.

I am also not persuaded that a stay pending payment of attorney fees is appropriate here.  Every indication is that Elliott would have no ability to pay an award of fees of the magnitude that SLS seeks in its motion.  As a result, if this Court awarded fees, her dismissal without prejudice would be, in effect, with prejudice.  The Eleventh Circuit has recognized that a dismissal without prejudice "that imposes payment of costs as a precondition to refiling is tantamount to a dismissal with prejudice if the plaintiff is financially unable to pay the costs and fees."  *Parrish v. Ford Motor Co.*, 299 F. App'x 856, 862 (11th Cir. 2008)

(construing Rule 41(a)(2)).  In this Circuit, dismissal with prejudice is considered a sanction of last resort, applicable only in extreme circumstances.  *See Bagley v. Tucker*, No. 4:12CV611-WS/CAS, 2013 WL 1912580, at *3 (N.D. Fla. Feb. 25, 2013) (citing *Goforth v. Owens*, 766 F.2d 1533, 35 (11th Cir. 1985)), *report and recommendation adopted*, 2013 WL 1912579 (N.D. Fla. May 8, 2013).  Here, SLS is essentially asking this Court to sanction Elliott for dismissing and re-filing her lawsuit and impose conditions that would likely make it impossible for her to prosecute her claims.  Again, I do not condone Elliott's tactics, but I do not believe that the Court should impose a sanction that would, in effect, bar her from litigating her claims.[10]

A final point bears mentioning.  Elliott has represented to the Court that she will not revisit issues in this Court that the Cherokee County Court rejected.  Elliott will be held to that promise.  If she does attempt to relitigate issues that the

---

[10] In its reply brief, SLS requests for the first time that the Court require Elliott's counsel to pay the costs that it seeks in its motion.  The Court will not consider a request made for the first time on a reply.  Moreover, the case on which SLS relies, *Whitehead v. Miller Brewing Co.*, 126 F.R.D. 581, 582-83 (M.D. Ga. 1989), is distinguishable because in that case, counsel decided to voluntarily dismiss the case in large part because of scheduling conflicts and his own heavy caseload.  Such personal motivations do not appear to be present in the case at bar.

Cherokee County Court decided, I will consider a renewed request for costs under Rule 41(d) at that time.  At this point, however, SLS's Rule 41(d) Motion will be **DENIED**.

## VI.   CONCLUSION

For the foregoing reasons, I **RECOMMEND** that SLS's Motion to Dismiss [Doc. 5] be **GRANTED IN PART AND DENIED IN PART**. Specifically, the following claims should be **ALLOWED TO PROCEED**:

- Count I (wrongful foreclosure), except to the extent that it is based on theories of improper distribution of excess proceeds;

- Count II (breach of contract), except to the extent that is based SLS's alleged failure to provide post-foreclosure notice to Elliott;

- Count III (breach of the implied duty of good faith and fair dealing);

- Count IV (intentional infliction of emotional distress);

- Count IX (conversion);

- Count X (punitive damages); and

- Count XI (attorney fees)

The following claims should be **DISMISSED WITH PREJUDICE**:

- Count I to the extent that it is based on improper distribution of excess proceeds of the foreclosure sale;

- Count II to the extent that it is based SLS's alleged failure to provide post-foreclosure notice to Elliott;

- Count IV to the extent that it assets a claim for negligent infliction of emotional distress;

- Count V (fraud);

- Count VI (negligent misrepresentation);

- Count VII (civil theft by deception);

- Count VIII (breach of legal duty); and

- Count X (money had and received)

It is **ORDERED** that Elliott's Motion to Strike Defendant's Motion to Dismiss [Doc. 12] be **DENIED**, that Elliott's Motion for Leave to Amend [Doc. 13] be **DENIED**, and that SLS's Rule 41(d) Motion [Doc. 26] be **DENIED**.

It is **FURTHER ORDERED** that should the District Judge adopt any of my recommendations such that any of Elliott's claims proceed, the parties shall contact the my chambers within **five (5) days** of such an order and submit proposed dates for holding an in-person scheduling conference before me to

address pretrial matters, including but not limited to discovery and the filing of dispositive motions.

IT IS SO ORDERED and RECOMMENDED this 10th day of July, 2017.

_____

JOHN K. LARKINS III
United States Magistrate Judge